The courts + my attorney will not produce the Pleading
for 30 CV 09429. I would prefer to remove that case
to federal court. I submit this so the court can understand
case

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Plaintiff(s),

Don Mashall

vs.

Case No. _____
(To be assigned by Clerk of District Court)

DEMAND FOR JURY TRIAL

YES [X]    NO [ ]

Defendant(s).

(Enter the full name(s) of ALL defendants in
this lawsuit. Please attach additional sheets
if necessary).

## COMPLAINT

PARTIES

1. List your name, address and telephone number. Do the same for any additional plaintiffs.

   a.  Plaintiff   Don Mashall dba 1st National Repossessors, Inc

   Name

   Street Address   950  Hwy  10 #4

   County, City   Sherburne   Elk River

   State & Zip Code   MN   55330

   Telephone Number   612 723 7780

SCANNED
FEB 04 2011
U.S. DISTRICT COURT MPLS

2. List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption.

   a. Defendant No. 1

    Name   Dannette Meek-Hull

    Street Address

    County, City   Isanti County, Isanti

    State & Zip Code   MN

   b. Defendant No. 2

    Name   Mike Hull

    Street Address   Unknown

    County, City

    State & Zip Code   ND

   c. Defendant No. 3   John DOE

    Name   Unknown

    Street Address

    County, City

    State & Zip Code

*Attorney Zach Smith 77 13th Av #204A Minneapolls MN 55413*

**NOTE: IF THERE ARE ADDITIONAL PLAINTIFFS OR DEFENDANTS, PLEASE PROVIDE THEIR NAMES, ADDRESSES ON A SEPARATE SHEET OF PAPER.**
**Check here if additional sheets of paper are attached:** [ ]
**Please label the attached sheets of paper to correspond to the appropriate numbered paragraph above (e.g. Additional Defendants 2.d., 2.e., etc.)**

2

JURISDICTION

Federal courts are courts of limited jurisdiction. Generally, two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount of damages is more than $75,000 is a diversity of citizenship case.

3. What is the basis for federal court jurisdiction? *(check all that apply)*

   [☒]Federal Question          [☒]Diversity of Citizenship

4. If the basis for jurisdiction is Federal Question, which Federal Constitutional, statutory or treaty right is at issue? If more than one, list each.

   *See Attached "Remove Case" Pleading*

5. If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party? Each Plaintiff must be diverse from each Defendant for diversity jurisdiction.

   Plaintiff Name: *Dom Marshal*          State of Citizenship: *MN*

   Defendant No. 1: *Dannette Meeks-Hall*  State of Citizenship: *MN*

   Defendant No. 2: *Mike Hall*          State of Citizenship: *ND*
                     *John Doe*                                *AZ?*

   Attach additional sheets of paper as necessary and label this information as paragraph 5.
   Check here if additional sheets of paper are attached. [☒]

6. What is the basis for venue in the District of Minnesota? *(check all that apply)*

   [ ]Defendant(s) reside in Minnesota   [☒]Facts alleged below primarily occurred in Minnesota

   [ ]Other: explain

STATEMENT OF THE CLAIM

Describe in the space provided below the basic facts of your claim. The description of facts should include a specific explanation of how, where, and when each of the defendants named in

*See attached Plintiffs Crmplaint*

the caption violated the law, and how you were harmed. Each paragraph must be numbered separately, beginning with number 7. Please write each single set of circumstances in a separately numbered paragraph.

7.

**Attach additional sheets of paper as necessary.**
**Check here if additional sheets of paper are attached:** ☒
**Please label the attached sheets of paper to as Additional Facts and continue to number the paragraphs consecutively.**

REQUEST FOR RELIEF

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking.

*See causes of Action In attached Plaintiffs Complaint*

4

| STATE OF MINNESOTA | TENTH JUDICIAL DISTRICT |
|---|---|
| COUNTY OF ISANTI | CASE TYPE: CIVIL |
| | CASE NO. 30-CV-09-429 |

Don Mashak and First National Repossessors, Inc.

Plaintiffs

V                                  PLAINTIFFS' ~~AMENDED~~ COMPLAINT 

Dannette Meeks-Hull and Michael Hull + J. \ n D.e

Defendants.

------------------------------------------------------------------------------

Plaintiffs, as and for their amended complaint in this matter, state and allege as follows:

1. On or about January 23, 2006 Defendant Dannette Meeks-Krenzlok (hereafter "Meeks" or "Ms Hull") terminated her employment with I st National Repossessors, Inc. (hereinafter "FNR");

2. On OR ABOUT January 23, 2006 Defendant Michael Hull, Defendant Meeks' husband, terminated his sub-contractor relationship with FNR.

3. 1 st National Repossessors, Inc. is wholly owned by Don Mashak (hereinafter "Mashak");

4. At the time Meeks quit, Mashak was out of the country and due to return the next day;

5. For a few weeks Michael Hull and Meeks had planned to quit FNR. In other words, both defendants knew they were going to quit their employment with FNR about the time Mashak left for vacation on December 31,2005;

6. 5) At various times during Meeks' employment (that commenced in 2004), Mashak overheard various comments by other company employees and agents that he felt were not ;

7. In the spring of 2005, Mashak paid for Meeks, and his sister Deanna Mashak, to fly to Houston Texas to visit another repossession company for training;

8. In the fall of2005 Mashak allowed Defendant Michael Hull to take Meeks for an unscheduled surprise vacation to celebrate their recent marriage;

9.  In September of 2005 Mashak cosigned for, took a 2nd lien in and executed a contract with "Right of Offset" so that Meeks could buy the 2000 Ford Excursion VIN IFMNU41S4YEC17692 (hereafter "2000 Ford Excursion"), as evidenced by a loan contract and 2nd lien contract;

10. Various issues caused Plaintiff Mashak to question the competence of Defendant Meeks in late fall of 2005;

11. Mashak decided he was going to try to squeeze in the vacation before he either motivated Meeks to improve her productivity or fire her because it would be a long time before someone else could be trained so Don Mashak could once again go on vacation;

12. Mashak left on vacation December 31, 2005;

13. While Mashak was out of town, Meeks was required to refer all issues of importance and urgency that came up to his sister, Deanna Mashak;

14. Payroll was to be delivered to Deanna Mashak's house five days in advance of pay day so funds could be transferred. This was not a big issue because Meeks passed within a couple ofblocks Deanna Mashak's house coming to and from home and the office;

15. Defendant Meeks laid down an ultimatum that she would quit if the payroll was not on time for the January 16, 2006 payday; and then she failed to deliver the payroll to Deanna Mashak before Deanna Mashak had to leave for work on the 16th• This contrivance would later be her basis for quitting;

16. While Mashak was on vacation, James Hocket was directed to pick up the company mail from the post office box a few days a week and deliver it to the office;

17. On a number of occasions while Mashak was on vacation, Tom Corder (the owner ofthe business across the hall from FNR) told Mashak that the FNR office was closed several times for long periods oftimes during normal business hours;

18. Plaintiff Mashak expressed his concerns to Meeks via phone and she became hostile and belligerent;

19. Mashak backed off on the confrontation and questioning, feeling helpless and powerless to do anything thousands of miles away;

20. Thereafter, Meeks corrected her observable behavior as was relayed to Mashak by persons sent to check up on the office found Meeks there;

21. Mashak then decided that there would be no grace period for Meeks to improve her performance; and, she would no longer be able to charge the company when she was not ;

22. At some point in time while Mashak was gone) Meeks erased the last approximately 3 months of email communications off her company owned computer after making written and electronic copies for herself;

23. Meeks erased the three or four months of email in the general email box to her; and, between herself and Mashak and others to cover up her theft of company proprietary information and communications that might demonstrate that she was stealing proprietary information;

24. This was done by Meeks to start her own company and/or go to work for a competitor;

25. Meeks also erased payroll and other records off the computer system before Mashak returned;

26.  Meeks also stole her personnel files, her husband)s records and any other of her relatives who had been FNR employees and/or agents before Mashak returned from vacation;

27. Meeks stole the files to destroy her the contract that included non-compete and non-disclosure provisions; and, to destroy any other incriminating information pertaining to her husband and relatives;

28. Meeks also stole the file containing the loan documents for the 2000 Ford Excursion;

29. While Mashak was on vacation, Meeks purposely and maliciously failed to deposit checks in Plaintiffs' Business Account;

30. Meeks and Defendant Hull also stole company property, files and documents from Plaintiff Mashak' s business;

31. Some of the stolen property included a cell phone, a camera, keys to the office and keys to Mashak's personal car among other items;

32. Tom Corder, the owner of a business across the hall from FNR, told Mashak that he saw Meeks transporting computer equipment (that belonged to Mashak and/or FNR) in her vehicle;

33.  Shortly before Plaintiff Mashak's return, Meeks then informed Mashak that she was quitting;

34. Mashak's flight was delayed due to a snow storm and as a result the office was going to be unmanned without the keys from Meeks;

35. Meeks told Plaintiff she had none of Plaintiffs' property until Plaintiff Mashak asked her about the office keys, which Meeks admitted to having and needing to return;

36. Meeks assured Mashak she would take and had no other property belonging to Plaintiffs.

37. Mashak asked Meeks to make arrangements to allow Deanna Mashak to pick up the keys or to bring her the keys to her residence;

38. When Meeks showed up, she refused to leave the keys with Deanna Mashak's daughters, despite instructions to do so, in yet another attempt to harass, annoy and cause immeasurable problem for Don Mashak. This is another display of the contempt for, and lack of fear Defendant Meeks now alleges she had of Mashak;

39. Mashak returned on or about January 24, 2006;

40. When Mashak returned, he first noticed the keys to his personal car missing. As the days went by, Mashak found several other items such as files, cell phone, camera, personal property and data missing. Mashak also found data deleted from the computers, especially payroll data;

41. James Hockett stated that he had brought in several large deposits of money while Mashak was on vacation and they were not reflected in the bank deposit records;

42. Most Notably, the day James Hocket startled Meeks by stating Mashak would be back in a day or two, Hocket verified he left approximately $3000.00 to be deposited; however, the deposit records for that day only showed about $600.00 was deposited;

43. Following Plaintiff Mashak's return, various company vendors and clients made vague references to Mashak about Meeks calling them up and bad-mouthing Mashak and FNR, but gave no specific details and were generally dismissive of the allegations;

44. Mashak found a discrepancy in the payroll. While there was only one vehicle for a person whose last name was Erkilla-Witt, the payroll that Meeks submitted showed one half of a debtors hyphenated last name had been used on the payroll ledger to evidence $100.00 to be paid to Agent Lee Baldwin, and the other half of the debtors hyphenated last name was used to evidence $100 to be paid to Defendant Meeks' husband Defendant Michael Hull;

45. Mashak contacted Lee Baldwin and asked if Defendant Hull had any involvement in the said repossession involving the debtor with the hyphenated last name. Lee Baldwin said Defendant Michael Hull had no involvement in the repossession whatsoever. Furthermore, while the notes on the Erkilla-Witt computer records are initialed by Meeks, there is no note of her husband having anything to do with the vehicle;

46. Mashak verily believes that any reasonable person would see the separating of the hyphenated name as the deliberate, duplicitous attempt to prevent Mashak from realizing the double payment;

47. The fact that there are no notes in the computer record for that account that mention Defendant Michael Hull or mention the need to move the vehicle, speaks to the false nature of the defense that Mashak said he would pay anything to have Defendant Michael Hull do anything with the vehicle;

48. Meeks did not inform Deanna Mashak that she was quitting, even though she was instructed to communicate all urgent and major issues to Deanna Mashak;

49. Defendant Meeks and Defendant Michael Hull at first denied having and/or stealing any company property;

50. Several more times, both Defendants denied having any property of Plaintiffs.

51. Defendants did not return the company property that they had at their house before Mashak returned;

52. Mashak asserts that the failure to return the property on or before Defendants' last day is much more consistent with Defendants having any company property in their possession with intent to steal it, than with the contention that it was items that Meeks had at home to work on after normal work hours and just forgot to return;

53. At some point after Mashak returned, Tom Corder told Mashak about an incident in which Meeks' vehicle had a window broken out of it. In viewing the damage Tom Corder noticed the computer equipment in the vehicle;

54. Plaintiff Mashak later noticed computers and equipment missing from the back storage room;

55. Mashak and his sister Deanna Mashak went to Defendants Meeks and Hulls' residence with the Anoka Sheriff's Department a few days after Mashak got back in town in January 2006 to recover whatever property they could, along with missing vehicles and a tow dolly;

56. Law Enforcement required that Mashak and his sister wait at the curb;

57. The deputy returned from their door with a few files and some keys;

58. Mashak and Deanna Mashak left with the files, the tow dolly and a vehicle that Defendants had previously denied having;

59. Plaintiff Mashak wrote Defendants a couple of letters in the weeks after he returned and had his attorneys write letters;

60. Defendant Meeks has admitted she had psychological issues before she began employment with Mashak and FNR;

61. Meeks told Mashak a story in December of 2005 wherein she claimed that earlier in her life her ex-husband was a big time drug dealer and that their marriage ended when he allegedly held a gun to Defendant Meeks' head while snorting cocaine from a huge pile like a scene out of the movie "Scarface";

62. Defendant Meeks, by her own admission, acknowledged that she had previously sought medical help for her psychological problems;

63. Defendant Meeks also told Mashak she was in the witness protection program for testifYing against her ex-husband;

64. Plaintiff Mashak alleges Defendant Meeks only sought psychiatric help after she received the notice that Plaintiffs were aware of her criminal activities;

65. Plaintiff Mashak asserts that if Defendant Meeks had an alleged nervous breakdown, it is the result her of realizing her various frauds and thefts had been discovered;

66. Defendant Meeks insisted to the Anoka County Sheriffs Department that the property that was returned via the Anoka Sheriffs Department was all the property they had;

67. Plaintiff Mashak's attorneys sent Defendants more letters demanding the return of stolen property, data and files. Finally, about a coule weeks later, after more denials of having company property, Defendant Hull returned yet more property, including the keys to Mashak's personal car to Plaintiffs' attorneys' office;

68. Other agents and employees of FNR and Deanna Mashak began telling Mashak that Meeks and her husband Michael Hull were trying to start there own repossession business after they left FNR;

69. In spring of 2006, Mashak learned that Meeks was working at another Twin Cities repossession company and called there to inform them of the non-compete agreement;

70. In July or August of 2006, Defendants tried to trade in the 2000 Ford Excursion, without disclosing the second lien held by Mashak;

71. Defendants apparently believed that the theft of the loan file would successfully end Mashak's proof of second lien on the vehicle which they attempted to trade it in violation ofMinn. Stat. §609.62;

72. Plaintiff Mashak has other causes of action to recover monetary damages from Defendants, one as simply being the cosignor and two, because of the uninsured damages the car experienced while in the care, custody and control of Defendants Meeks and Hull and/or their agents and assigns;

73. When Walzer Car sales called, Plaintiff Mashak asked for $2000.00 to release the lien. Walzer decided to undo the deal, rather than pay the payoff;

74. In an attempt to damage Mashak's credit, Meeks insisted the vehicle had to be repossessed; and, Defendant Meeks said she would not allow Mashak to take possession directly;

75. Further Defendant Meeks insisted the 2000 Ford Excursion be repossessed so Plaintiff Mashak would be forced to pay it off rather than continue to make payments on it;

76. The credit union holding the loan repossessed the vehicle;

77. Defendants insisted the vehicle was in great shape as did the credit union; however, they would not let Mashak see it before he paid for it;

78. Mashak paid off the loan with the credit union in cash but was not allowed to pick it up that day;

79. Steve Lolls, Mashak's business associate, said he was interested in buying the 2000 Ford Excursion for his wife for between $9000.00 and $10,000.00, if it was in good condition;

80. When Mashak and Steve Lolls showed up to pick up the 2000 Ford Excursion from the credit union, it was severely damaged;

81. Due to the condition of the vehicle Steve Lolls backed out of buying it;

82. Neither the credit union nor Defendants would provide any explanation for what had happened to the vehicle nor the insurance information so that Mashak could make an insurance claim;

83. Defendants thereafter claimed that they bought the vehicle in that poor condition; however, their claims are refuted by the person they bought the vehicle from who stated there was only one dent on the comer and some superficial scratches; and, there was nothing close to the terrible condition the unit was in when Mashak redeemed the vehicle;

84. Mashak sent a notice of Right to Redeem and Sale to Defendants;

85. Due to the poor condition of the vehicle, and increasing gas prices, Mashak initially didn't get any good bids for the vehicle;

86. Mashak sent Defendants a notice and accounting of deficiency in a timely manner in June of 2007;

87. Defendants failed to pay the deficiency;

88. Thereafter, Mashak offered to give the vehicle back and let Defendants out of all costs directly involving it if they paid the original $6,900.00 Mashak paid the credit Union;

89. Defendants did not accept that offer;

90. The 2000 Ford Excursion was sold in June of2007 for $5,500.00;

91. In January of2008, Mashak filed a small claims court claim against Defendants;

92. Defendants avoided service of process for several months and moved to Isanti County;

93. Defendants' new address was discovered by a in late November or early December 2008;

94. The day after Mashak gave notice to the courts of the need to change venue, Meeks served a harassment restraining order on Mashak, claiming the entire small claim was baseless.;

95. The trial court granted the order, which was based upon false evidence, testimony and motive. [Court File No. 30-CV -08-1298] Plaintiff Mashak asserts that Defendant Meeks made the claim of harassment in bad faith, when it became apparent she could no longer avoid service of process and would be held accountable for her criminal acts;

96. Plaintiff Mashak alleges that all of said false statements were made with malice, with the express intention of Defendants furthering their own interests and/or causing Plaintiff Mashak severe mental and financial duress.

97. Mashak has taken and passed a polygraph with regards to the most egregious of Defendant Meeks' allegation;

98. Plaintiffs' have obtained the affidavits of several employees and agent in the relevant time period who dispute Defendants allegation in this regard;

99. Defendant Meeks is known to not be credible, as evidenced by affidavits of various employees, agents and clientsl. When Meeks sought employment with Plaintiffs, she represented she

previously was a Hennepin Country Sheriffs Deputy, which was false.  Some ofFNR's clients stated that Meeks also told them she had been a Hennepin County sheriff Deputy;

100.    Defendant Meeks had a power struggle with one of FNR's agents and that agent investigated and demonstrated that Defendant Meeks had lied about being a sheriffs deputy; and, was a actually a staff-worker in the child protection unit;

101.    Meeks now denies ever saying she was a Hennepin County Sheriffs Deputy. In fact, she apparently stole her personnel file to prevent discovery of her lie;

102.    Plaintiffs realleges paragraphs 1 -10A above.

## COUNT ONE - Intentional Infliction of Emotional Distress

103.    Defendants made statements to third parties alleging that Mashak had sexually harassed  them and/or had made improper sexual advances and/or had told them he had sex with minors in the Phillipines;

104.    Defendants' statements were false;

105.    Mashak reallege paragraphs 1 -10A above; 124) Defendants actions herein are extreme and outrageous and have passed the boundaries of decency to the extent that the actions are utterly intolerable to the civilized community;

106.    Defendants' actions were intentional and/or reckless;

107.    Defendants actions have caused emotional distress to Mashak;

108.    The emotional distress suffered by Mashak has been severe in nature to the extent that no reasonable person could be expected to endure it;

109.    As a direct and proximate result of Defendants' actions, Mashak has been injured and harm to an extent greater than $50,000 which Mashak is entitled to recover;

## COUNT TWO - Breach of Fiduciary Duty

110.    Mashak realleges paragraphs 1 -109 above;

111.    Defendants owed a fiduciary duty to Plaintiffs in the capacity of employees who were entrusted with confidential and proprietary information and who were required to act in the Plaintiffs' interests, not their own;

112.     Defendants breached their fiduciary duty to the Plaintiffs by their actions, as enumerated above;

113.     As a direct and proximate cause of Defendants' wrongful actions Plaintiffs have been damaged in an amount in excess of $50,000 which Plaintiffs are entitled to recover;

## COUNT THREE - Tortious Interference With Business Advantage

114.     Plaintiffs reallege paragraphs 1 -113 above;

115.     Plaintiffs had the reasonable expectation of economic advantage or economic benefit through the continued operation of FNR;

116.     Defendant had knowledge of the expectation since they were privy to it as employees;

117.     Defendants wrongfully and unjustifiably interfered with that expectation by stealing customer lists, client files and/or proprietary business information;

118.     Defendants' actions have prevented Plaintiffs from obtaining an economic advantage in Plaintiffs' line of work that Plaintiffs would have obtained but-for Defendants' interference;

119.     Defendants' actions were intentional;

120.     As a direct and proximate result Plaintiffs have been damaged to an extent greater than $50,000 which Plaintiffs are entitled to recover;

## COUNT FOUR - Abuse ofProcess

121.     Plaintiffs reallege paragraphs 1 -120

122.     Defendants alleged in said action that Mashak was stalking them and engaging in harassing behavior toward them;

123.     Mashak had engaged in no such activity against the Defendants and in fact was merely attempting to lawfully utilize the court system to seek lawful redress against said Defendants;

124.     Defendants on the other hand improperly abused the court system to wrongfully obtain harassment relief in an attempt to thwart Mashak's lawful attempt to seek legal redress;

125.     The harassment statutes were not intended to act as a shield against justified litigation; rather, they are intended to prevent a person or persons from engaging in harassing activities as defined by the statutes;

126.       In obtaining the harassment order in this matter Plaintiffs wrongfully engaged in perjury and misrepresentation;

127.       As a result of Plaintiffs ' abuse of process the harassment order issued, which has caused damages to Mashak in excess of $50,000;

128.       In addition to monetary damages incurred by Mashak, the findings in the harassment action and resultant order continue to inflict great harm and damage to the Plaintiffs' business and personal reputations;

129.       The only way to rectify the prior and continuing damage is to vacate the harassment order in its entirety and to expunge the proceeding;

130.       Statutory authority for the vacation and expungement of the harassment order is set forth in Minn. Stat. §548.14,

"Any judgment obtained in a court of record by means of perjury, subornation of perjury, or any fraudulent act, practice, or representation of the prevailing party, may be set aside in an action brought for that purpose by the aggrieved party in the same judicial district within three years after the discovery by the aggrieved party of such perjury or fraud. In such action the court may either enjoin the enforcement of the judgment or command the satisfaction thereof, may compel the party procuring the same to restore any property received by virtue thereof, and may make such other or further order or judgment as justice shall require; but no right or interest of a third party acquired under such judgment in good faith, and without knowledge of the wrong complained of, shall be affected by the action herein provided for; provided, if during the pendency of such action the enforcement of such judgment or an action thereon shall become barred by the statute of limitations, and such judgment is sustained, the same may be enforced, or an action commenced thereon, within one year after such action is finally determined. "

Mashak seeks said vacation and expungement herein;

## COUNT FIVE - Theft of Trade Secrets

131. Plaintiffs reallege paragraphs 1 -130 above;

132. Defendants, in the scope of their employment, obtained information, devices, methods and techniques that had intrinsic economic value that was not generally known to competitors in the repossession business that the Plaintiffs are engaged in;

133. Defendants were required to sign non-disclosure, non-compete and confidentiality agreements as part of their employment due to the need for secrecy to protect Plaintiffs' interests in said property;

134. Plaintiffs unlawfully misappropriated said information, devices, methods and techniques; That as a direct and proximate result of said misappropriation, Plaintiffs have been damaged in excess of $50,000 which they are entitled to recover;

135. Plaintiffs have also incurred and will incur attorney's fees and costs as a direct and proximate result of said misappropriations which Plaintiffs are entitled to recover;

## COUNT SIX - Intentional Interference With Contract

136. Plaintiffs reallege paragraphs 1 -135 above;

137. Defendants, through their employment with Plaintiffs, were aware of contractual relationships that Plaintiffs had with third parties;

138.Defendants intentionally attempted to interfere with and/or convert those relationships for their own monetary benefit;

139.As a direct and proximate result of Defendants' wrongful actions, Plaintiffs have been harmed to an extent greater than $50,000 which Plaintiffs are entitled to recover;

## COUNT SEVEN - Breach of Contract

140. Mashak realleges paragraphs 1 -139 above;

141. Mashak and Meeks entered into a contractual agreement wherein Mashak signed and obligated himself for the purchase of a 2000 Ford Excursion;

142. Meeks on the other hand agreed to timely make the payments when due on said vehicle and to keep said vehicle in good ~orking order and condition;

143. Meeks breached her agreement by failing to timely make the payments and by failing to keep the vehicle in good working condition;

144. As a direct and proximate result of Meeks' breach, Mashak has been damaged in the amount of$3,000.00 which Mashak is entitled to recover against her;

## COUNT EIGHT - Conversion

145. Plaintiffs reallege paragraphs 1 -144 above;

146. During the course ofDefendants ' employment with Plaintiffs, Defendants were placed into a position to handle various business property, equipment and money;

147. As more fully described above, Defendants wrongfully stole, converted and/or absconded with monies and properties belonging to the Plaintiffs;

148. While the exact value of the monies and property is unknown at this time, it is likely greater than $50,000;

149. Plaintiffs are entitled to recover said amount from the Defendants;

150. Plaintiffs reallege paragraphs 1 -149 above;

151. Meeks wrongfully attempted to defeat Mashak's security interest in the 2000 Ford Excursion identified above by attempting to sell said vehicle without first satisfying Mashak's security interest therein;

152. As an alternative to Count Eight, Mashak is entitled to recover any losses he sustained as a direct and proximate result of Meeks ' failure to keep the subject vehicle in good working condition and appearance and her failure to timely make payments against said vehicle; 175) Mashak is entitled to recover $3,000.00 from Meeks;

## COUNT NINE - Breach of Non-compete Agreements

153.) Plaintiffs reallege paragraphs 1 -152 above;

154. Defendants entered into non-compete and non-disclosure agreements with Plaintiffs;

155. Said agreements called for liquidate damages of $25,000 for violations of said agreements;

156. Defendants violated said agreements by obtaining employment contrary to said agreements and by disclosing information contrary to said agreements;

157. Plaintiffs are entitled to recover from Defendants the sum of$25,000 for said violations;

WHEREFORE, PLAII'I"TIFFS REQUEST THE FOLLOWING RELIEF OF THIS COURT:

1. The vacation and/or expungement ofthe harassment order contained in Court File No. 30-CV-08-1298 and the permanent sealing of said file;

2. Granting the Plaintiffs damages against the Defendants, jointly and severally, in an amount in excess of $50,000;

3. Granting the Plaintiffs their attorney's fees, costs and disbursements herein; and

4. For such other and further relief as to the Court is fair and just.

Dated: 1/4/11

Don Mashak
Pro Se
POB 231
Albertville MN 55301
612-723-7780

Count 10 RICO

Signed this **15th**      day of **January,**      **2009.**

Signature of Plaintiff _____

Mailing Address

POB 231
Albertville MN 55301

Telephone Number

612 723 7780

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint and provide his/her mailing address and telephone number. Attach additional sheets of paper as necessary.

Plaintiff 2
FNR

POB 231

Albertville MN 55301

612 723 7780

5